Final case for argument this morning is 15-2029 Purdue Pharma v. Depomed. Good morning. Good morning, Your Honors, and may it please the Court. The Board in this case had before it two very close references, the Beveha reference and the 837 patent. Those two references fit tightly together and taught all the limitations of the challenge Depomed patents. The Board found three things that are important. One, that all of the limitations of the challenge Depomed claims, patents and claims, were present in the prior art references. Two, that there was no teaching away, contrary to an argument Depomed had made and re-urges here. And three, that the two references may, and that's the Board's term, may be interrelated. And in fact they are, and we'll see that in a moment. Mr. Castanhas, the Patent Office has confirmed and quoted this patent multiple times. It issued it. It, I think there was an endo action that confirmed the patentability and it's done so here. Are they wrong all those times? Yes. And here's why. Despite the three findings that I just laid out for you, Judge Lurie, the Board stopped short of an obvious mis-holding in this case and instead felt that Purdue had failed, perhaps as an evidentiary matter, we're not entirely sure, but we had failed to show motivation to combine these references with a reasonable expectation of success. The Board got to where it did by applying a rigid and highly formalistic version of KSR that can't be squared with KSR itself or its progeny from this court. Now at pages 826 to 829, Your Honor, the Board gave... I think you were listening to the last argument. I was indeed. And we find ourselves, I think, on the other side of the point here. But I don't think we have any holes to fill here, and I'll tell you why. If I could go through the three reasons that the Board ruled against us, and those appear at pages 826 to 829, that's the first of the three decisions that they're replicated in the other decisions. First, the Board ruled that Purdue had not persuasively explained, quote, how or why, how or why a person of ordinary skill would have combined the swelling and substantially intact features of the 837 patent with the Veja. Now, if that how or why ruling is understood as meaning that Purdue's evidence was conclusory or vague, as my friend on the other side says in his red brief, that's not supported by substantial evidence. They really said it was unpredictable. Isn't that the core of what we're talking about? That is the third argument that was offered by the Board in opposition, and that is that there wouldn't have been a reasonable expectation of success. And I'll go through very quickly, Judge Newman, what the Board's three rulings were. One, that we failed to show how or why. Two, that the nature of the problem to be solved was contrary to their decision. I appreciate that. But where did they say it was predictable, that this particular modification? Right. Judge Newman, what the Board did in that regard was to look to the expert testimony and say, well, formulation is inherently unpredictable. There are a whole lot of factors to be used. But all of that testimony that was relied upon by the Board, both Dr. Bodmeier's, our expert's testimony, as well as Hoppenberg and Elm, which were their witnesses, that testimony was given in the abstract. It was given without any reference to Veveha or 837 as the starting points. When you start, Judge Newman, with Veveha, you've got, admittedly, everything except the swelling and the substantially intact limitations expressly on that reference. Now, we've made an anticipation argument in our petition. But the petition was not initiated on that ground. And so, unfortunately, because of the strange procedures of the PTAB, we can't come here and urge anticipation as an alternative ground for affirmance because it wasn't addressed in the final decision. Referring back to the earlier case that we all just sat through, I mean, the main complaint there, whether legitimate or not, we have yet to decide, is the lack of discussion by the Board, the lack of analysis. Here it seems to me that whether you like it or not, we've got a deferential standard of review. We had witnesses, the experts, their testimony was discussed in detail by the Board, explained by the Board why they rejected one and not another. Even the point you just made, they dealt with that point. And they said they're not persuaded that you've shown sufficiently that, however you pronounce the reference, inherently teaches the entirety of the swelling limitation. And then they go on to explain their result. I mean, we've got some deference here we have to show. There were experts on both sides of the issue. This is a complex field. This is tough. And the fact that your expert came and said, I could do it in a week, the Board just discounted that. But that's not the critical aspect. We're not arguing evidence here, and we're not saying, well, gee, you should take into account my guy's evidence versus their guy's evidence because it's better. That's not the point. All of the evidence that the Board relied upon with regard to the unpredictability issue was evidence in the abstract. We're not writing on a blank slate here, though. And that's what KSR reminds us. We're not taking a blank piece of paper and saying, OK, design something that has all of the limitations of the challenge to implement patents. What we're doing is we're taking Beveja and 837, parts of the prior art, which a person of ordinary skill is presumed, that objective hypothetical construct, that person is presumed to know that Beveja and 837 exist. Dr. Helm, one of their co-inventors, said she didn't even know about them. She didn't do any prior art search. That took her a really long time. That's what the Board relied upon. That's evidence, but it's not evidence of what a person of ordinary skill would have done with Beveja and 837 sitting in front of them. And the burden is on you. And I'm trying to carry out that burden here on appeal as well because what the Board did was not address that argument. The Board addressed a different argument, which is the argument that if you were writing on a blank slate, it would be very difficult to formulate. And formulations, I admit, can be unpredictable. We're not talking unpredictability here. Beveja tells you one polymer, HPMC. It doesn't just tell you HPMC. It tells you where to get it and what city to get it from. That's right on the face of the Beveja reference. Then it discloses two high-solubility drugs. Beveja, those are the only formulation requirements aside from the ratios, which were also disclosed in Figures 1 and Figure 2. The swelling and substantially intact limitations are not jugglery further ingredients or further components that have to be added. They're simply qualities. And what 837 adds to the mix is it tells us that if you take HPMC and you take a high-solubility drug and you put it together in the ratios that Beveja discloses in Figures 1 and 2, you will get swelling and substantially intact. Those limitations will be met. And remember, the board said all the limitations are present in the prior art. There was nothing absent, no hold of them. So to recap, with regard to the board's first ruling against us, which is the algorithm. Was anticipation raised in the petition for IPR? It was raised in the petition, and the board did not initiate on that ground. So under their procedures, they don't issue a final decision on it. We would be under the accusation that we were asking to have an initiation, a non-reviewable initiation decision reviewed here if we were arguing anticipation. But we did the next best thing. We said 837 answers any questions you've got with regard to the two supposedly inherently present or now we have to pretend that they're missing elements from Beveja. But just to recap, the board's three rulings against us. On how or why, that's not the legal standard. If it was meant to be a ruling that our evidence was inadequate, insufficient, vague, or conclusory, as my friend says, that can't be supported by substantial evidence. If you look at Dr. Bodmeier's declaration from 819.55 to 819.62, paragraphs 121 to 133, 13 detailed paragraphs with extensive reasoning supported by pinpoint citations to the two pieces of prior art and detailing two distinct reasons why a person of ordinary skill would have combined 837 with Beveja, their interrelated teachings and the nature of the problem to be solved. That's a far cry from the only cases that we've been able to find from this court that use the term how or why in a genetics in its footnote 3, an early post-KSR decision, in which it said that in that case there was a complete absence of proof as to the motivation to combine. But that's the only way that how or why could be understood as a factual, substantial evidence failure on our part, and that holding itself is not judging and supported by substantial evidence. What we do think the board did instead was to turn that how or why into something of resembling the rigid teaching suggestion motivation test that the Supreme Court emphatically rejected in its KSR decision. What the board did, without any really prior reference to this standard, is to hang us up for failing to satisfy a legal standard which doesn't appear in any case that they cite or in anywhere in the initiation decision or was even raised at the argument. And the way it was applied against us, we think, made the obviousness test into a rigid and mandatory formula. What was once supposed to be a helpful insight became rigid and mandatory. That takes care of the first reason. The second reason was the argument that Purdue's recitation of the problem to be solved was essentially a recitation of Defamette's challenge claim. That was the ground on which review was instituted, and that can be found in the institution decision. The board reversed course in its final decision and said, no, that's just the claim. We've shown on page 44 of the blue brief why that's wrong, and you can find every single aspect of the problem to be solved right on the face of the 837 patent, including the addition of high-solubility drugs, which are right there. Finally, and this goes back to my discussion with Judge Newman earlier, the board's holding that a person of ordinary skill would not have had a reasonable expectation of success were not drawing a blank piece of paper. We start with the VAHA. The VAHA tells us one polymer, tells us two high-solubility drugs. It gives us two figures, one and two, that show the polymer-to-drug ratio. Then all you need to do is go to the VAHA to learn quite clearly and unmistakably that when you do the VAHA, you will get swelling and substantially intact. Unless the court has further questions for me, I'll reserve the remainder of my time. Mr. Andre? May it please the court, Paul Andre and Han Lee for Defamed. The board, in this case, made extensive factual findings that Purdue did not provide substantial evidence to support three very important legal principles, any one of which would be enough to defeat their petition. The first, as my friend has talked about, is the reason to combine these references. I apologize for my throat. I have a little laryngitis. There was no reason at all given by Petitioner, in this case, Purdue, to combine these references. There was a general conclusory statement by their expert that said, well, of course you'd look at these two references because they're both in the same general field of polymer science. That's not enough. The burden on Petitioner is to provide the glue that holds these references together. Why do you put these references together? The how and why question, based on the PAR pharmaceutical case, is just that. Why would you do this and how would you do it? But your friend is right, is he not, that we've all read KSR to not require any rigidity or any specific disclosure in that regard. And the board was very clear on that they did not put that rigid standard in. In fact, it was a very flexible standard. They just looked for evidence. They said, give us evidence as to just something. Let me ask you something. It raised my eyebrows a bit when I read a red brief when the board clearly concluded here that all of the claim limitations existed in the prior art and that there was no teaching away. It rejected your arguments in that regard. It doesn't give me a lot of comfort that the board is right when you choose to spend a lot of your defense of the board arguing a theory that the board rejected. Well, the point that we argued that the board rejected was the teaching away. And I think that is an issue of law. There's no distributive fact. The reference says what it says. It says that the first formulations are a major disadvantage. That's factual. Okay, so let's assume that we disagree with you and we agree with the board on teaching away. What are we left with here? We would also say that, as KSR Court said, all inventions are made up of known components. And going back to the prior art and trying to pick and choose those components is not enough. That's where you have protections in for the obviousness standards. So we're not contesting the board's factual findings as to whether or not they're all there. We disagree with it, but we're not here to contest that. This appeals about whether or not the petitioner put substantial evidence in to support the obviousness determination. And the board determined they didn't. So how much more? What was missing? I mean they did have their – they did have a witness. Now the board, I guess, criticized their witness for having said it would take me five days and that doesn't deal with the time of the invention. Yeah, I actually took that deposition where he said that. And when this witness was testifying in deposition and in his declaration, he gave very general, broad conclusions. He went back and cherry-picked prior art based on complete hindsight. What you would require here is something in the teachings that would tell those skilled in art at the time. Now there's the other criticism the board had of their expert. He said they did not use one skilled in art at the time of the invention. He was looking at one skilled in art as of today, another criticism. So the fact of the matter is, is we didn't have the burden of proof. We put forward two declarations that contradicted the legal arguments and the factual arguments that counsel is making. Mr. Andrew, what's your answer to the assertion that the VEA is missing only the two qualities or results of the formulation? I would disagree with that determination. But they don't differ structurally. Yeah, and pharmaceutical formulations. They say they're missing two qualities. That could mean ten different components that could actually attribute those qualities. That's the big issue here. In our inventor's declaration. If in fact your invention structurally contains materials that produce those qualities, are they simply unrecognized in the earlier reference? No, I would say not because... Or unstated. Well, I would say not. And the reason being is because the fact that the polymer happens to be a given polymer, HPMC polymer. Just because it happens to be there doesn't mean it's going to give the qualities. It has to be there in certain ratios and certain proportions. And this was the three years of experimentation that it took Depp and Mann to do to get to this invention. Three years of trial and error. Going through and testing different concentrations. There are, like I said, at least ten different factors. Ten different components that the inventor testified to that took this three years of full-time work. And if you look at all the possibilities, how you would mix and match those, they kind of well over a million. As the petitioner's own expert said, it could be in the millions, plural. So not only did it not show the reason to combine, but there is no evidence for the reasonable expectation of success, as Judge Newman asked about earlier. The fact of the matter is, here in this case, every declarant, ours and theirs, said there were numerous possibilities. Without any kind of certainty what was going to work. In fact, like I said, it took three years for it to work. Dr. Ms. Helms, the inventor, talked about the amount of work it took to get the release of the drug over the rate, the swelling, at the size, and without restriction. And having the type of drug that would be loaded into the formulation was very unpredictable. The fact that one of the largest pharmaceutical companies in the world, BMS, Bristol-Myers Squibbs, came to them and said, can you do this? We can't. It tells you something right there. And that's what this invention was about. The third issue that counsel brings up is looking at hindsight. Using our patent as a template or a recitation of the problem to be solved. Nowhere in the prior art were people trying to solve this problem. There's no recitation. So what the petitioner did improperly was take our claim language, almost verbatim, that's what the board found once again, and said, that's the problem to be solved. Now, go back with hindsight and see if you can find the art. In our red brief, we give a chart of all the different references that the board actually instituted on. And the board instituted on, it looked like a poster child for hindsight reconstruction. There were numerous references, and the board has a pretty low standard on instituting these trials, as I think this court is very well aware of. Almost 9% at the time this one was filed. And also, the PTAB is not shy about invalidating claims. In fact, in the pharmaceutical science, once a trial is instituted, over 9% of the time, the board invalidates claims. In this case, the board instituted. We came through and showed them that there was no evidence to support this finding. And they flipped. That feed into itself. Now, when we talk about the reference, you ask about Beveha and the teaching away. When I worked in science for years, and when I would read a reference, and they said, this is a major disadvantage of this formulation. As one skill you are at the time, that would tell you not to go there. It's a major disadvantage. It's discouraging my use of that formulation, regardless of how you read it. The board found, as a matter of law, that it was not a teaching away, but the facts were not disputed. But even if you were to agree with the board that this is not a teaching away, which is hard to imagine, this is not a teaching away. But if you agree with them, the fact that the primary reference lacked so many different elements. We argued that it lacked four elements. The board agreed to them. But those two elements could lead to a vast amount of uncertainty that you just couldn't account for. The last thing I want to talk about, if you have any questions, is the secondary considerations. It's not an issue upon appeal, but the mere fact that you can judge the merits of this appeal brief by the fact that they've asked this court to invalidate these claims. But you read the board's decision, we put in an amazing amount of secondary considerations for non-obviousness. Everything from commercial success, unexpected results, licensing, etc. The board did not address those. So at the very least, the best that petitioner could ask for would be remanded back for further findings. But that's not what they did. They actually want this court to invalidate the claims without even looking at the secondary considerations. So I think that goes to really telling this court what this appeal is about. They're throwing a Hail Mary pass because they went to the PTAB, they lost. And now they're trying to make this a legal argument instead of what it really is. A factual argument where the board cited their facts, chapter and verse. Any questions? Thank you for your time. I'll be very brief. I think teaching away is regarded as a question of fact, and that fact's been found against them. I think it's inappropriate, as we pointed out in our gray brief, for that to be re-urged here. With regard to secondary considerations, which we just heard about, that wasn't briefed either by my friend on the other side. The request for a remand in lieu of a reversal comes a little late when he had the opportunity to put that in his red brief. And in fact, the ruling here was made not only on the independent claims, but the dependent claims as well, based on the same rationale that we discussed, the three points made by the board in its opinion. And you can find that with regard to the dependent claims at pages A32, A34, A70, and A105. Finally, with regard to the claim of years of experimentation, I think I've already answered this point, but I'm going to underscore it here. The years of experimentation took place with Depamed because they weren't aware of Bebeja. They weren't aware of the prior art. Their co-inventor, Helm, testified that she wasn't even aware of her co-inventor's 837 patent. Remember, 837 is a Depamed patent that Dr. Schell is the lone named inventor on, and he is also an inventor on the two challenge patents in this case. The person of ordinary skill is an objective, hypothetical construct. It's not subjective, so in terms of secondary considerations, whether it took three days, three months, three years, or three centuries for Depamed to make what it made is not relevant. What is relevant is what a person of ordinary skill would have done with Bebeja on one hand and 837 on the other. And the answer is very clear. It was an extraordinarily limited universe of possible options. It is not the formulator's nightmare of millions and millions of possible options. When I read Bebeja, I see basically two options. It's one polymer. It's two high-solubility drugs. And the ratios are overlapping in figures one and two with the ratios that are in 837, and the ratios claim that's in a chart that's on page 14 of our reply brief. And that yields us at least a presumption of obviousness, which has not been rebutted, and that ought to be conclusive in this case. So unless the court has further questions for me, I thank you for your time. Thank you. We thank both counsel when the case is submitted, and that concludes our proceedings for this morning. All rise.